United States District Court
District of Connecticut
FILED AT NEW HAVEN

February 5 ,20 24

By S. Santos
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT                    ss: NEW HAVEN

COUNTY OF NEW HAVEN                     3:24-mj-00107 (MEG)

## MASTER AFFIDAVIT

I, Zachary C. Weis., being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of
Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws
and duly authorized by the Attorney General to request a search warrant.  I am a Deputy United
States Marshal assigned to the United States Marshals Service (USMS) District of Connecticut and
have been so employed, since January 11, 2022.  In May 2022, I graduated from the United States
Marshals Service Basic Training Program at the Federal Law Enforcement Training Center in
Glynco, GA, where I received training in conducting criminal investigations to include fugitive
investigations.  I am currently assigned to the USMS Hartford, Connecticut sub-office, and I am
also assigned to the USMS Violent Fugitive Task Force for the District of Connecticut.  Prior to my
employment with the USMS, I was employed as a Game Warden for the State of North Carolina,
from January 2019 to December 2022.  In this capacity, my responsibilities included enforcing
North Carolina state laws and gaming statutes.  During my career with the USMS, I have
participated in multiple fugitive investigations for violations of state and federal laws.  I have
worked on multiple successful fugitive investigations from this court in conjunction with other
federal, state, and local agencies.

1

2.     I know based upon my training and experience that most cellular telephones have two basic components: 1) a handset, i.e. the telephone device itself; and 2) a chip, or SIM card (i.e. Subscriber Identity Module Card), which is inserted into the handset, and which can easily be removed and transferred to another handset.  A handset is inoperable without a SIM card, except where it is used to place emergency 911 calls.  I know, moreover, based upon my training and experience, and my investigation in this case, that cellular service providers maintain the following information, or identifiers, regarding each cellular telephone to which they provide service: (a.) MSISDN, or Mobile Station ISDN, which is the ten-digit telephone number; (b) IMEI/ESN, or International Mobile Equipment Identity/Electronic Serial Number, which is the unique serial number assigned to the handset device itself and/or MEID/Device ID, or Mobile Equipment Identifier, which is a form of ESN; and (c) IMSI, or International Mobile Subscriber Identity, which is a unique 15-digit code associated with the mobile subscriber and which is stored on the SIM card that is inserted into the handset.  When a SIM card is inserted into a handset, and the handset is turned on, the SIM card transmits the telephone number, IMSI and IMEI associated with the cellular telephone to the Companies' networks, thus registering it with the networks so that communications to and from the cellular telephones can be facilitated.

3.     I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I am also authorized to seek search warrants under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. Sections 2703(c) and 2703(d).  I am a participating member of the USMS Connecticut Violent Fugitive Task Force, which is comprised of personnel from the U.S. Department of Homeland Security, the Connecticut State

Police, and the Bridgeport, Hartford, New Haven, Norwalk, and Waterbury police departments.  I am currently participating in the investigation seeking to find Ramon SOTO, a.k.a. "Tio," who has been indicted by a federal grand jury in the District of Connecticut in a matter captioned *United States v. Ramon Soto*, 3:23-CR-00099 (SRU).  An arrest warrant pursuant to the indictment has been issued by the United States District Court for the District of Connecticut for the apprehension of SOTO, and he is currently a fugitive from this court.  I am working this case in conjunction with the United States Postal Inspection Service (USPIS) New Haven Office, and the New Britain Police Department.  Based on information that I have learned from the USPIS, the New Britain Police Department, and elsewhere, I have probable cause to believe that SOTO currently uses cellular telephone number (646) 956-9598 **("Target Telephone")**.  Accordingly, the location of this **Target Telephone** will help the USMS, the USPIS, and the New Britain Police Department to arrest SOTO.

4.      I submit this affidavit in support of an application for an order authorizing the installation and use of a pen register device or process, a trap-and-trace device or process, and for the disclosure of certain electronic communications records and/or information.  I also submit this affidavit in support of an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(c)(1)(A), authorizing agents of the United States Marshals Service ("USMS"), and the United States Postal Inspection Service ("USPIS"), to ascertain the physical location of (646) 956-9598 ("**Target Telephone**"), (the "Requested Information"), for a period of thirty (30) days, and the use of a Cell-Site Simulator (CSS).

5.      The **Target Telephone** is believed to utilized by Ramon SOTO with wireless communications service provided by T-Mobile, (the "Provider"), which is further described in Attachment A.  There is probable cause to believe that SOTO has committed violations of 21

U.S.C. §§ 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine; and 922(g)(1) and 924(a)(8) (Unlawful Possession of a Firearm by a Felon). As described below, SOTO was charged with these offenses by a federal grand jury on October 17, 2023, and is the subject of an arrest warrant issued in the District of Connecticut on the same date. The information described in Attachments B, C, and D will assist in locating and arresting SOTO.

6. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

7. Pursuant to Rule 41(b)(2), law enforcement may locate the **Target Telephone** outside of the district provided the device is within the district when the warrant is issued.

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

9. Based upon information known to me due to my participation in this investigation, as well as information which I have determined to be accurate and reliable, provided to me by other law enforcement officers, I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

10.     This affidavit is intended to show merely that there is a sufficient foundation of probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**RELEVANT FACTS**

11.     The United States Postal Inspection Service (USPIS) has been investigating the Soto Family Drug Trafficking Organization ("Soto DTO"), suspected of trafficking large quantities of cocaine from Puerto Rico to Central Connecticut (New Britain and Waterbury) area, off-loading the cocaine as a bulk reseller to other Connecticut and Massachusetts distributors, and repatriating drug proceeds back to the island of Puerto Rico through money launderers located in the Bronx, NY. Based on the number of shipments tracked, and the amount of cocaine seized by the USPIS, USPIS Inspectors believe that the Soto DTO is responsible for shipping at least 6-10 kilograms of cocaine per week into Connecticut and a total of over 500 kilograms of cocaine during the charged conspiracy timeframe.

12.     On May 1, 2023, members of the U.S. Postal Inspection Service executed a federal search and seizure warrant at Ramon SOTO's residence of 31-33 Wakefield Ct, New Britain, CT. Agents of the USPIS seized a .380 caliber handgun; .380 caliber ammunition; an unloaded Glock magazine; money counters; and a digital scale containing white powder residue, which tested positive for the presence of cocaine, among other items, pursuant to the execution of the search and seizure warrant. Ramon SOTO was not home at the time of the execution of the search and seizure warrant, and he was suspected to be in Bronx, NY. Investigation by the USPIS identified Ramon SOTO as the manager of this address utilized as a stash location for his nephew, Joseph Giovanni Soto, who was arrested by USPIS on May 1, 2023, and charged in the original indictment on June 7, 2023. *See* Case No. 3:23cr99(SRU). The USPIS learned through its investigation that Ramon

SOTO would also drive bulk cash to the Bronx, NY, where it would be laundered back to Puerto Rico at the instruction of Joseph Giovanni Soto, and the cocaine supplier in Puerto Rico, currently known as "LP." Associates of the DTO residing at the delivery addresses would either drive the parcels directly to Ramon SOTO or Joseph Giovanni Soto. On some occasions, the parcels would remain at the delivery addresses until either Ramon SOTO or Joseph Giovanni Soto came to pick them up. Through the USPIS investigation, investigators learned that delivery address recipients were paid $1,000 per parcel for their participation and assistance in the conspiracy.

13.     On May 2, 2023, SOTO attempted to turn himself in to the New Britain Police Department, however, the New Britain Police Department advised that they did not have an active warrant for SOTO. The New Britain Police Department subsequently advised SOTO to contact the USPIS.

14.     On May 3, 2023, USPIS Inspector Geoffrey Maynard received a telephone call from counsel representing SOTO. Inspector Maynard advised defense counsel about the nature of the case against SOTO and to contact the United States Attorney's Office for the District of Connecticut.

15.     During the weekend of May 6, 2023, a pole camera monitored by the USPIS at 31-33 Wakefield Court, New Britain, CT indicated that SOTO's apartment was being cleaned out by two females (one of which is his daughter). SOTO was not observed on the pole camera.

16.     On October 17, 2023, testimony was presented to the Grand Jury in New Haven, CT and defendants Melvin MATTEI and Ramon SOTO were indicted along with Joseph Giovanni Soto in a superseding indictment in the District of Connecticut. Case No. 23cr99(SRU). Arrest warrants were subsequently issued for these individuals, and NCIC entries were made by the USPIS. Coordination with SOTO's defense counsel was attempted by the USPIS. Defense counsel was

advised of the indictment and that the USPIS could facilitate a self-surrender. Defense counsel indicated that he would contact the SOTO family and respond. Several weeks later, defense counsel advised that he attempted to contact the SOTO family, but his calls were not returned. Defense counsel later advised investigators that he no longer represented SOTO.

17.    In anticipation of SOTO's indictment, agents of the USPIS attempted to locate SOTO, from late August 2023, through October 2023, by requesting records associated with SOTO, and performing numerous spot checks of Connecticut addresses he was associated with. USPIS confirmed that SOTO moved from 31-33 Wakefield Court, and he did not leave a forwarding address. During the investigation, USPIS identified a cellular telephone (929) 422-2825, subscribed to SOTO and serviced by T-Mobile, as being used by SOTO, however while records analyzed by the USPIS suggested that SOTO kept his cellular telephone following the May 1, 2023 search, (929) 422-2825 active, the telephone calls appeared to be getting forwarded to an unknown number. Facebook records were also obtained by the USPIS, which confirmed that (929) 422-2825 was a telephone number utilized by SOTO, but did not indicate recent logins or IP activity that would be helpful in locating SOTO. USPIS conducted license plate reader (LPR) checks regularly, and it was determined that SOTO's vehicle that he was last known to be operating (a 2014 Hyundai Santa Fe) was frequently located at 672 Evanston Circle, Fort Lauderdale, FL. Historical LPRs suggest that the vehicle made its way from Connecticut to Florida in June 2023, and had been parked at the address since early July 2023.

18.    On November 1, 2023, USPIS Task Force Officers Larry Smith and Andrew Tomer traveled with Inspector Maynard to Fort Lauderdale, Florida in attempt to locate and arrest Ramon SOTO. At approximately 12:45 pm, surveillance of 672 Evanston Circle was established, however, SOTO's vehicle was not there. At approximately 1:29 pm, SOTO's vehicle, as described above,

pulled into the driveway and two females exited the vehicle. The females were identified as SOTO's daughter (D.S.) and SOTO's ex-wife (J.S.). Both females explained that SOTO was not there, and he had given the vehicle to his daughter (D.S.) over the summer. D.S. explained that she's had a distant relationship with her father, but recently began to communicate with him more. During the summer of 2023, her vehicle broke down and SOTO offered to give her his vehicle. D.S. and her brother flew to Connecticut in July or August 2023 and drove the vehicle back to Florida from Hartford. D.S. believed that SOTO may be in Bronx, NY, based on conversations that she's had with him, but did not know where in the Bronx, or anywhere else that SOTO may be residing.

19.     J.S. advised agents of the USPIS that she has two children with SOTO, but she has not seen or heard from SOTO in over 10 years. J.S. invited agents of the USPIS into her residence, and members of the USPIS confirmed that SOTO was not there. J.S. stated that SOTO was not part of her life, and he did not support her children. At the direction of the USPIS, D.S., utilizing her cellular telephone ending in 8929 called the number that she has for SOTO – the original phone number (929) 422- 2825 – at least four times, in attempt to contact him and allow USPIS Inspectors to speak with him. SOTO did not answer the calls. Inspector Maynard subsequently contacted SOTO at the above listed number which went to voicemail. Inspector Maynard left a voicemail message with his name and contact information and advised SOTO that he needed to speak with him further about his pending case in the District of Connecticut. Based upon my review of the call detail records from the original telephone number ending in 2825 and the **Target Telephone**, and as explained further in paragraphs 26 through 28, I believe that SOTO checked his missed calls and voicemail using the 2825 number, and then immediately called D.S. from the **Target Telephone** while USPIS agents were present.

20.     D.S. advised that SOTO has another daughter who was living with him at his apartment in New Britain.  That daughter (possibly K.S.) subsequently moved to the Orlando, FL area.  D.S. doesn't speak to her, but she is aware of her moving there. Subsequent checks of LPRs showed another vehicle registered to SOTO (2006 Toyota Solara BA36464) also departing Connecticut over the summer of 2023 and spending time in the vicinity of 175 E. 151st Street, Bronx, NY.  This address is a former address associated with SOTO.  Based on LPR checks, this vehicle is now consistently parked in the area of 505 Macaw Lane, Casselberry, FL, which is consistent with what D.S. stated.

21.     On November 28, 2023, USPIS TFO Smith and Inspector Maynard went to 175 E. 151st Street, Bronx, NY, and established surveillance in front of this address for approximately (6) hours.  They were able to get entry into the apartment building and confirmed that Apartment's 4L and 4D were associated with each other, and probably were occupied by SOTO's family members. SOTO's mother, C.S., is believed to reside in one of those apartments.  TFO Smith and Inspector Maynard did not observe SOTO during the surveillance of this address.

22.     In early December 2023, TFO Smith and Inspector Maynard met with Affiant Weis, and other members of the USMS, to request assistance in locating SOTO.  USPIS subsequently delegated apprehension of SOTO to the USMS.

23.     As of this date, SOTO has not surrendered, despite efforts by law enforcement and his former counsel to contact him, and I believe that he has knowledge of the arrest warrant due to the investigative efforts described herein, and he remains a fugitive from this court.

## SOTO USES THE TARGET TELEPHONE

24.     On May 2, 2023, the day after the execution of the search and seizure warrant at SOTO's residence, based on a review of records as described above, I believe that SOTO discontinued utilizing (929) 422-2825 as his primary cellular telephone. Based on my training and experience, it is common for fugitives to discontinue utilizing their cellular telephones to avoid apprehension and aid in their flight. A review of records related to the phone number (929) 422-2825 revealed that SOTO may be using the **Target Telephone**. Since December 2023, Affiant Weis, and Senior Inspector Charles Wood of the USMS have conducted toll analysis of cellular telephones (929) 422-2825 and the **Target Telephone** believed to be utilized by SOTO. I have reviewed records for the original number ending in 2825 from February 1, 2023 through January 30, 2024, and I have reviewed records for the **Target Telephone,** from October 1, 2023 through January 30, 2024. Based on this analysis, and the analysis of call detail records for SOTO's most frequently called numbers from these telephones, Affiant Weis, and Senior Inspector Wood, believe that SOTO obtained the **Target Telephone** to contact his family members and associates, subsequent to the execution of a federal search and seizure warrant at his residence in New Britain, CT, on May 1, 2023.

25.     Specifically, I believe that on May 2, 2023, SOTO activated the **Target Telephone**, a postpaid account subscribed to his mother, C.S., 120 W 112th, New York, NY 10026, with service provided by T-Mobile. Affiant Weis and Senior Inspector Wood compared the toll records for the **Target Telephone,** and the original number ending in 2825, and determined that there were (25) separate telephone numbers in common called by both telephones, to include family members and associates, indicative of a common user. Among these telephone numbers were SOTO's son, R.S.; his daughter, D.S.; his brother, V.S.; and his brother J.S.2, who is the father of co-defendant Joseph

Giovanni SOTO; and a cellular telephone subscribed to SOTO's ex-wife, J.S., among others. Affiant Weis and Senior Inspector Wood have also analyzed call detail records for (347) 543-1654 subscribed to J.S.2; (954) 200-5557 subscribed to SOTO's ex-wife, J.S.; and (580) 458-7896 subscribed to V.S., which determined that the only separate telephone numbers in common called among all three of them are the cellular telephones believed to be utilized by SOTO as set forth above.

26.     In addition, Affiant Weis and Senior Inspector Wood analyzed call detail records for D.S.'s cellular telephone ending in 8929, the **Target Telephone,** and the original number ending in 2825.  Affiant Weis and Senior Inspector Wood observed that on November 1, 2023, during Inspector Maynard's interview with SOTO's daughter (D.S.) and ex-wife (J.S.) as described in paragraphs 18 and 19, there were (4) separate telephone calls from D.S. to the 2825 number during her interview with USPIS Inspector Maynard. The first call was at approximately 13:31:31 hours (approximately 7 seconds in duration.).  Immediately following this telephone call, Affiant Weis and Senior Inspector Wood observed that approximately 30 seconds later, the next call dialed by the 2825 number dialed was (360) 842-9999, which I know to be the T-Mobile voicemail platform.  At approximately 13:33:55, the **Target Telephone** dialed D.S. (approximately 2 seconds in duration) and again at 13:35:20 (approximately 15 seconds in duration).  I believe that SOTO checked his voicemail from D.S. using the 2825 number, and he then returned the call from the **Target Telephone**.  I further suspect that these calls were not answered by D.S. because she was being interviewed by USPIS agents.

27.     Affiant Weis and Senior Inspector Wood also observed the same pattern surrounding the inbound call from USPIS Inspector Maynard to SOTO's original number ending in 2825 during that same interview on November 1, 2023.  Specifically, at approximately 13:52:48, USPIS

11

Inspector Maynard left a voicemail message on the 2825 number (approximately 27 seconds in duration), and the 2825 number dialed the T-Mobile voicemail platform, approximately 30 seconds after receiving this telephone call. USPIS Inspector Maynard did not receive a telephone call from SOTO.

28. Further, on the same date, the 2825 number received (3) additional inbound calls from D.S. at approximately 13:43:59 (approximately 7 seconds in duration); 13:44:32 (approximately 4 seconds in duration); and 13:44:56 hours (approximately 4 seconds in duration). In each of these calls, Affiant Weis and Senior Inspector Wood observed that the 2825 number dialed the T-Mobile voicemail platform, approximately 30 seconds after receiving each of these incoming calls from D.S. There were no additional numbers dialed or received by the 2825 number between the calls from D.S., and the calls from 2825 to the T-Mobile voicemail platform. Further, I observed an inbound call from D.S. to the **Target Telephone** at approximately 14:02:52 hours (approximately 56 seconds in duration). The **Target Telephone** then called D.S. at approximately 14:06:48 hours (approximately 5 minutes and 58 seconds in duration). I suspect that these calls were answered by D.S. after her interview with the USPIS concluded.

29. In addition to the analysis cited above, on December 17, 2023, at approximately 14:52:46 hours, the 2825 number received an inbound call from J.S. (approximately 5 seconds in duration). Approximately 30 seconds later, the 2825 number called the T-Mobile voicemail platform. Analysis of call detail records for J.S., and the **Target Telephone,** indicated that the **Target Telephone** contacted J.S. immediately after the 2825 number dialed the T-Mobile voicemail platform. Affiant Weis and Senior Inspector Wood did not observe any other outbound or inbound calls to J.S.' telephone during this time period.

30. On January 1, 2024, the 2825 number received an inbound call from V.S. at

approximately 12:30:21 (approximately 49 seconds in duration) and 12:38:04 (approximately 59 seconds in duration). Although SOTO did not then dial the T-Mobile voicemail platform, I observed that the **Target Telephone** then called V.S. (4) times, at approximately 12:32:50 (approximately 17 seconds in duration); 12:33:40 (approximately 18 seconds in duration) and at 12:38:45 (possible missed call with no duration) and 12:43:04 (possible missed call with no duration). I believe that V.S. attempted to contact SOTO on 2825, and SOTO returned the calls from the **Target Telephone**.

31.     Based on the analysis cited above, and my participation in this investigation, I believe that since the enforcement activity on May 1, 2023, the 2825 number predominately receives inbound telephone calls with short durations, and the next dialed call by the 2825 number (approximately 30 seconds later) is to the T-Mobile voicemail platform. Since the execution of the search and seizure warrant on May 1, 2023, I believe that SOTO has kept (929) 422-2825 active, and the calls are mostly answered by voicemail. After checking these voicemail messages, I have observed, and I believe, that SOTO would then immediately return the calls from the **Target Telephone**, which is indicative of a common user of both telephones. As time progressed since May, 1, 2023, this pattern has slowed down significantly, as I believe that most of SOTO's (25) common contacts with the 2825 number are now calling him on the **Target Telephone**. As of January 30, 2024, both telephone numbers utilized by SOTO – the (929) 422-2825 number and the **Target Telephone** – are both active.

32.     I believe the installation and use of pen-register devices or processes and trap-and-trace devices or processes, as well as the requested electronic communications records, and/or information concerning the **Target Telephone** will provide information that is relevant and material to the ongoing criminal investigation described above. Among other things, this information will

assist in determining who is using and/or calling the **Target Telephone** to direct surveillance efforts to locate and apprehend Ramon SOTO.

33.     Based on the foregoing, there are reasonable grounds to believe that the information likely to be obtained by the installation and use of a pen register device or process and trap and trace device or process on the **Target Telephone** is relevant to the ongoing criminal investigation, and that specific and articulable facts are set forth in this supporting Affidavit showing that there are reasonable grounds to believe that the electronic communications records and/or information sought are relevant and material to the ongoing criminal investigation. The Requested Information will assist law enforcement officers in arresting SOTO, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4). In addition, although cell-tower site information is helpful in knowing generally where the phone is, it does not allow officers to initiate or conduct surveillance in a meaningful way as the Requested Information will.

34.     Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the activities described above. The Requested Information is necessary to determine the location of the user of the Target Telephone, previously listed herein, so that law enforcement agents can conduct physical surveillance to locate and arrest Ramon SOTO, who is a fugitive from this court.

35.     WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing deputies of the USMS, and agents and officers of the USPIS, to obtain the Requested Information for the **Target Telephone** for a period of thirty (30) days. In addition, it is requested that the Court enter an Order authorizing agents to install a pen register and trap and trace device, with cell site activations, and for disclosure of telecommunications records with respect to the **Target Telephone**.

## APPLICABLE CELLULAR PHONE TECHNOLOGY

36.     In my training and experience, I have learned that the Service Providers are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

37.     Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available.

38.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Telephone**. Specifically, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the

15

customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

39.     Based on my training and experience, I also know that telephone companies, like T-Mobile, also collect data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD").  For each cellular telephone accessing its network, providers, such as T-Mobile, use PCMD and other data to calculate and record the estimated location of that cellular telephone. T-Mobile refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call").  Provider AT&T refers to this information as NELOS (Network Event Location System) and Provider Verizon Wireless refers to this information as RTT (Round-Trip Timing).

40.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers, as transmitted from a cellular device to a cellular antenna or tower, can be collected by the service provider and indicate the identity of the cellular device making the communication without revealing the communication's content.

41.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.

## MANNER OF EXECUTION OF CELL SITE SIMULATOR

42.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

43.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the **Target Telephone** or receiving signals from nearby cellular devices, including the **Target Telephone**.  Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.  The device may send a signal to the **Target Telephone** and thereby prompt it to send signals that include the unique identifier of the device.  Law enforcement may monitor the signals broadcast by the **Target Telephone** and use that information to determine the location of the **Target Telephone** even if the T**arget Telephone** is located inside a house, apartment, or other building.

44.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to connect with the **Target Telephone**, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the **Target Telephone**, and law enforcement will limit collection of information from devices other than the **Target Telephone**.  To the extent that any information from a cellular device other than the **Target Telephone** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the **Target Telephone** from all other cellular devices.

### AUTHORIZATION REQUESTS

45.     Based on the foregoing, there is probable cause to believe that the use of the cell site simulator will help investigators determine the location of the user of the **Target Telephone** so that law enforcement agents can conduct physical surveillance to locate and apprehend Ramon SOTO, who is a fugitive from this court as described herein.

46.     WHEREFORE, I request that the Court issue the proposed search warrants.

47.     I further request that the Court issue the proposed search warrant pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41, directing T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court authorize the use of a pen register and trap and trace device as the information sought is material and relevant to an on-going investigation. A search warrant may not be legally necessary to compel the investigative technique described herein (*i.e.,* the use of a cell

site simulator).  Nevertheless, I hereby submit this warrant application out of an abundance of caution.

48.     I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network, and at such intervals and times as directed by the government. The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

49.     Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night and because of the potential need to locate the Target Telephone outside of daytime hours in an effort to apprehend SOTO.

50.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days from the end of the period of authorized surveillance.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent

that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

51.    I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation, efforts at apprehension of a suspect and the methods being used by law enforcement in attempting to locate a fugitive.  Public disclosure could jeopardize this investigation and cause the target of the investigation to avoid apprehension, flee and/or destroy evidence, and unnecessarily endanger investigators involved in the on-going efforts to apprehend the target of this investigation.


Respectfully Submitted,


ZACHARY WEIS
Digitally signed by ZACHARY WEIS
Date: 2024.02.05 10:40:21 -05'00'

Zachary C. Weis.
Deputy United States Marshal


Sworn to and subscribed to me by telephone on this the 5th day of February, 2024.


Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2024.02.05 14:04:52 -05'00'

Honorable Maria E. Garcia
United States Magistrate Judge

## <u>ATTACHMENT A</u>

Records and information associated with the cellular device assigned phone number (646) 956-9598, subscribed to Candida Soto, 120 W 112th St., New York, NY 10026 (the "**Target Telephone**"), that is stored at premises controlled by T-Mobile (the "Service Provider"), a wireless telephone service provider headquartered in Parsippany, New Jersey.

# ATTACHMENT B

## I.   Information to be Disclosed by T-Mobile

To the extent that the information described in Attachment A is within the possession, custody, or control of T-Mobile, including any information that has been deleted but is still available to T-Mobile or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), T-Mobile is required to disclose to the government the following information pertaining to the **Target Telephone** listed in Attachment A **for the time period of 30 days prior to the date of signing and through the date of this Orde**r, **AND for the period extending 30 days from the date this warrant is issued**:

a. The following information about the customers or subscribers of Target Telephone:

   i.   Names (including subscriber names, user names, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (All Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, WiFi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from Target Telephone 1; and,

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Telephone, including:

   i.   The date and time of the communication, the method of the communication, and the

source and destination of the communication;

ii. Call detail records to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by the Target Telephone, for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to- mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits);

iii. Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as all available per-call measurement data (PCMD), Timing Advance Information, Timing Advance Report Date, and True Call data; the approximate range of the Target Telephone from the cell towers during the communication (including per-call measurement data "PCMD", round-trip time "RTT" data, Historical Mobile Locators "NELOS", Radio Signal Strength Indicators (RSSI) for the period of this Warrant, and other pertinent information delivered in real time with regard to neighboring towers as feasible;

iv. The MAC address to include Wi-Fi MAC address and/or the access point(s) to which the Target Telephone connects to the internet via wireless technology that allows computers and other devices to communicate over a wireless signal (commonly referred to as Wi-Fi), and packet data; and

v. All Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from the Target Telephone.

c. All precise location information, including E-911 Phase II data, GPS data, and Latitude-longitude data.

T-Mobile (hereinafter "the service provider") must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information about the location of the Target Telephone unobtrusively and with a minimum of interference with service provider services, including by initiating a signal to determine the location of the Target Telephone on the service provider's network, and at such intervals and times directed by the government. The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance.

Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.  *See* 18 U.S.C. §§ 3121-3127.  This warrant therefore includes all the information required to be included in a pen

register order.  *See* 18 U.S.C. § 3123(b)(1).

In approving this warrant, the Court finds reasonable necessity for the seizure of the location information set forth above.  *See* 18 U.S.C. § 3103a(b)(2). This warrant does not authorize the collection of any content of any communications or the seizure of any tangible property.

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 841(a), 841(b)(1)(B) and 846 (conspiracy to possess with intent to distribute narcotics) by, or the location of, Ramon SOTO, a person to be arrested. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## ATTACHMENT C

Pursuant to an investigation of violations of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), as further described in the Affidavit, this warrant authorizes the Officers and Agents to whom it is directed to determine the location of the **Target Telephone** identified in Attachment A by collecting and examining:

1. Radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. Radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by Officers and Agents

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).